Filed 6/24/13  B.J. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| B.J. et al., <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF SAN FRANCISCO COUNTY, <br><br> Respondent; <br><br> SAN FRANCISCO HUMAN SERVICES AGENCY, <br><br> Real Party in Interest. | A138336 <br><br> (San Francisco County <br> Super. Ct. No. JD11-3075) |

B.J. and K.U. (parents) petition this court for an extraordinary writ pursuant to Welfare and Institutions Code section 366.26 and California Rules of Court, rule 8.452, seeking review of the juvenile court's order terminating their reunification services and setting the matter for hearing to implement a permanent plan for their son, B.T. (minor).[1] Parents seek this relief on the ground that the evidence in the record fails to support the juvenile court's findings that they failed to make substantial progress on their case plan and that returning minor to their care would present a substantial risk of harm to his physical or emotional well-being.  We deny the writ petition, and deny as moot parents' related request for a stay of these proceedings.

---

[1]     Unless otherwise stated, all statutory citations herein are to the Welfare and Institutions Code, and all references to rules are to the California Rules of Court.

**FACTUAL AND PROCEDURAL BACKGROUND**

On March 10, 2011, a petition was filed in San Francisco County pursuant to section 300, subdivisions (b), (c) and (g), alleging that minor, then five years old, had suffered or faced substantial risk of suffering serious physical harm or illness as a result of parents' failure or inability to adequately supervise or protect minor, or as a result of parents' willful or negligent failure to adequately supervise or protect minor from the conduct of the custodian with whom minor was left; had suffered or faced substantial risk of suffering serious emotional damage as evidenced by minor's severe emotional anxiety, depression, withdrawal or untoward aggressive behavior toward self or others as a result of parents' behavior or failure to provide appropriate care; and had been left without provisions for support necessary for his physical or emotional health and safety (hereinafter, section 300 petition). Specifically, the section 300 petition alleged, among other things, that parents had abandoned minor, who was found traveling from Mexico to the United States on February 26, 2011, under the care of an adult male named Ewan Brighting. Minor was described as "dirty and smelly, drinks out of a bottle, has rotten teeth, is non-verbal, and has behavioral problems," as evidenced by his acts of kicking, spitting and scratching several people before attempting to run away. Although the San Diego CPS (contacted by Homeland Security) found the situation "odd," Brighting was nonetheless permitted to take minor into the United States because minor seemed bonded to him and Brighting had documents from parents authorizing him to do so.[2]

San Francisco Human Services Agency (agency) social worker Gomez and her supervisor visited minor at Brighting's San Francisco residence on March 3, 2011. They observed that minor, who was dirty and smelled of urine, had speech and behavioral

---

[2] The CPS worker also stated that minor was crying and non-engaging throughout the interview, and that Brighting was unable to calm him down or control him. Brighting, described as a close family friend who had lived with parents in Mexico for several months before returning to the United States on February 26, 2011, later told the agency it was parents' idea for him to take minor with him. Father disagreed, claiming it was Brighting's idea, although they authorized it, and mother claimed to the CPS she opposed the idea.

problems, including an inability to sit still, avoidance of eye contact and acting out by, among other things, throwing items at them. Brighting confirmed these problems and acknowledged minor had never been assessed for social services. Brighting also advised that minor generally slept with him in his bed.

On March 8, 2011, the juvenile court ordered minor removed from Brighting's care and taken to the Child Protection Center (CPC). The CPC ordered an immediate assessment of minor due to his "out-of-control" behavior, which included kicking, spitting, and screaming. Eventually, minor calmed down, yet kept his right hand inside his pants, touching his penis, prompting social worker Gomez to ask him whether anyone had touched him there. Minor responded by identifying Brighting. A few days later, the juvenile court found that a prima facie case had been made that minor came within section 300, and thus ordered him detained and placed in foster care.

The juvenile court subsequently ordered a settlement conference for April of 2011, prior to which the appropriate Mexican social services agency, DIF, conducted a home study of parents' residence in Mexico. This study revealed that parents' home lacked a working bathroom and was surrounded by piles of trash and other waste that, parents advised, was awaiting recycling. In addition, it was noted that a report had been filed by parents stating that minor had been physically or verbally abused in the home by his aunt F.M.

When the agency's social worker, Kristina Pock, later spoke to parents, mother expressed disbelief at the agency's description of minor's poor condition when they found him, and claimed his rotting teeth were simply from eating too much candy. She admitted minor had not received dental care even though it was available and inexpensive in Mexico. Father also confirmed he used to sell drugs and was now barred from entering the United States after being thrice deported for various violations. Pock concluded parents lacked the necessary parenting skills to care for minor, noting that mother seemed more annoyed than happy to hear from him despite a two-month absence, and that minor did not seem to recognize or be excited to speak to parents.

3

Meanwhile, the foster mother in San Francisco with whom minor was placed reported that, when he arrived, he was not socialized, was unable to drink from a cup or use the toilet, and could barely speak. Minor had also been abusive to the other foster children, engaging in sexually aggressive behavior such as trying to touch his foster brother's penis and to passionately kiss other children on the mouth. While minor had made significant progress since his arrival, learning to use a cup and the toilet, to follow instructions and to play properly with the other children, he still exhibited speech and language problems. The agency arranged for him to begin individual therapy for sexual abuse and to complete a psychological assessment.

Social worker Pock filed addendum reports on August 11 and October 5, 2011.[3] Among other things, these reports noted that federal officials were investigating Brighting for suspected child trafficking and that "questionable nude pictures of [minor] and other male children" had been found on his computer. Minor had received extensive dental treatment and had become more socialized, but still exhibited sexualized and aggressive behaviors. His vocabulary had improved, although his speech remained delayed. Parents had been ambivalent about phone visitation, raising inappropriate topics and concern about others listening in. Minor was unwilling to speak to father. The agency recommended mandatory weekly therapeutic visitation via Skype in light of these concerns.

On a positive note, parents had begun receiving family therapy to comply with the case plan's requirement of parenting education, and had begun paperwork at a school for minor. DIF also confirmed parents' installation of a bathroom and agreed to conduct monthly home visits for six months for minor's safety.

On October 21, 2011, the juvenile court sustained allegations in the section 300 petition with respect to subdivisions (b), (c) and (g). In addition, the court adopted the case plan proposed by the agency, which required parents, with assistance from DIF, to improve the sanitation of their home by removing waste materials from the yard and

---

3    Settlement conferences held on June 13, July 12, and August 18, 2011, were unsuccessful.

providing a working bathroom; to secure therapeutic services to address minor's speech and language deficiencies; to secure medical services to address his dental and other health needs; to enroll in and complete a parenting class; and to adopt a safety plan to ensure minor is not abused again by his aunt. Finally, the court adopted the agency's recommendation for supervised weekly therapeutic phone calls via Skype.

A status review hearing was held on April 19, 2012, after which six additional months of services were ordered. The report and addendum filed in anticipation of this hearing reiterated many of the concerns set forth in the August and October 2011 addendum reports. (See Status Review Report 4/19/12 filed April 17, 2012, *supra,* at pp. 3-16.) For example, the report noted ongoing problems with parents' case plan compliance. Among other things, a second DIF home study was delayed due to father's request; father had participated in just two of ten phone visits; mother had begun family therapy, yet insisted her therapist have no contact with the agency regarding this case; trash in parents' yard remained a problem; and, although parents had insisted a local school could provide minor speech therapy, a letter from the school failed to mention it. A DIF representative had spoken to social worker Pock and expressed concerns regarding parents' apparent pattern of lying and manipulation. This representative mentioned an incident of mother secretly video-taping a DIF home visit, and explained that mother did not appear to trust the agency or DIF. In addition, Pock advised that parents continued to trust Brighting, to discuss the case with him, and to defend him. Father, in particular, had told Pock that he did not believe the allegations in the section 300 petition, did not believe there were any problems with his home, and did not consider it wrong to send minor away with Brighting. Mother, in turn, appeared to defer at all times to father.

The agency's report also stated, however, that minor was doing very well socially and academically in kindergarten, was receiving speech and language therapy, was participating in bi-weekly therapy sessions with Lydia Santiago, and had been psychologically assessed by Brianna Coffino, Ph.D., at the Child Trauma Project. This assessment observed that minor displayed symptoms relating to his uncertain home

situation and unpredictable relationships, and to his possible traumatic experiences with Brighting.

Following the August 2012 status review hearing, the juvenile court continued reunification services with the goal of minor's return to parents, and the matter was set for an 18-month review hearing.

The 18-month review hearing occurred in March of 2013, a report for which was prepared by social worker Pock. As before, this report noted ongoing concerns regarding parents' mistrust of the agency and its findings, and their continued trust of and reliance on Brighting. The report also noted Pock's frustrations with parents' progress in meeting certain case plan requirements, such as improving their parenting skills and recognizing their role in minor's dependency. For example, parents were not receptive or cooperative with respect to services and did not believe minor needed therapy or had been mistreated. While visitation via Skype was mostly appropriate, parents were in denial about their son's significant speech and language delays and his need to participate in a special education program. In addition, parents had made clear they would not maintain a relationship with minor's foster family if he were returned.

Dr. Coffino, in turn, had submitted a 17-page report based on extensive interviews with minor, parents, the foster family, and professionals who had been working with the family. Like Pock, Dr. Coffino was concerned with parents' ongoing denial of minor's past abuse and current impairments, and their ongoing support of Brighting. Dr. Coffino also expressed doubts regarding parents' ability to adequately care for and protect minor, given their lack of concern or remorse for placing him in Brighting's care in the first place and lack of acknowledgement of his difficulties. Ultimately, Dr. Coffino advised that minor continue receiving services and maintaining relationships with both parents and his foster family, whether he stay in the United States or return to Mexico.

At the 18-month review hearing, the juvenile court heard testimony from social worker Pock, Dr. Coffino, Dr. Lieberman (consulting therapist), and therapist Loveseth (who supervised Skype visitation). In addition to the facts set forth above in the agency's report, the witness testimony revealed that the DIF had now closed its case in Mexico;

6

parents had failed to secure speech therapy or a special school for minor (or even to acknowledge his need for it); parents had failed to validate their own participation in therapy; parents continued to defend Brighting and to refuse to agree to maintain a relationship with minor's foster family should he be returned; and father continued to participate only minimally in visitation. Drs. Coffino and Lieberman, moreover, confirmed minor still had significant emotional difficulties stemming from his severe neglect, deprivation and "most likely also, actual abuse." They strongly advised minor not be returned to Mexico given the unacceptably high risk of relapse due to parents' continued denial of any problem or concern, and given minor's need of a structured, nurturing and loving home environment with access to services.

On March 28, 2013, at the hearing's conclusion, the juvenile court found by clear and convincing evidence that the agency had offered reasonable services, but that parents had failed to make substantial progress with the case plan. The juvenile court further found that returning minor to parents' physical custody would present a substantial risk of detriment to minor's safety or physical or emotional well-being. The juvenile court thus terminated reunification services and set the matter for a selection and implementation hearing on July 29, 2013.

Parents filed a timely petition and related request for a stay.

**DISCUSSION**

Parents challenge the March 28, 2013, order terminating reunification services and setting the matter for a permanency planning hearing on the ground that the evidence was insufficient to support the juvenile court's findings that they failed to make significant progress with the case plan and that returning minor would create a substantial risk of detriment to his safety, protection or physical or emotional or well-being. The following legal principles are relevant to their challenge.

When a child is removed from parental custody, the juvenile court must order reunification services to assist the parents in reuniting with the child. (§ 361.5, subd. (a).) Where, as here, a minor without siblings involved in the dependency system, and is over the age of three at the time of his initial removal from the physical custody of the parents

7

or guardian, "court-ordered services shall be provided beginning with the dispositional hearing and ending 12 months after the date the child entered foster care as provided in Section 361.49, unless the child is returned to the home of the parent or guardian." (§ 361.5, subd. (a)(1)(A).) "If the time period in which the court-ordered services were provided has met or exceeded the time period set forth in subparagraph (A) . . . of paragraph (1) of subdivision (a) of Section 361.5 . . . and a child is not returned to the custody of a parent or legal guardian at the permanency hearing held pursuant to subdivision (f), the court shall do one of the following: [¶] (1) Continue the case for up to six months for a permanency review hearing, provided that the hearing shall occur within 18 months of the date the child was originally taken from the physical custody of his or her parent or legal guardian. . . ." (§ 366.21, subd. (g)(1).)

Following such a continuance, the juvenile court must "order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. . . . The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental. In making its determination, the court shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.5; shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of services provided . . . ." (§ 366.22, subd. (a).)

Thus, applying this statutory framework to the facts at hand, the juvenile court found that returning minor to parents would create a "substantial risk of detriment to [his] safety, protection, or physical or emotional well-being" due at least in part to "[t]he failure of . . . parent[s] . . . to participate regularly and make substantive progress in court-ordered treatment programs . . . ." (§ 366.22, subd. (a).) On appeal, we review the juvenile court's factual findings for substantial evidence. (*Elijah R. v. Superior Court*

(1998) 66 Cal.App.4th 965, 969, 971; *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341.)  In doing so, "we may look only at whether there is any evidence, contradicted or uncontradicted, which supports the trial court's determination. We must resolve all conflicts in support of the determination, and indulge in all legitimate inferences to uphold the court's order. Additionally, we may not substitute our deductions for those of the trier of fact." (*Elijah R. v. Superior Court, supra,* 66 Cal.App.4th at p. 969; see also *In re Stephanie M*. (1994) 7 Cal.4th 295, 318.) Ultimately, our task is to decide whether any reasonable trier of fact, considering the entire record, could properly have made the challenged decision. (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633; see also *In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581 ["on appeal . . . the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong"].)

Having considered the record as a whole and in a light favorable to upholding the juvenile court's March 28, 2013 order (*Elijah R. v. Superior Court, supra,* 66 Cal.App.4th at p. 969), we conclude substantial evidence does indeed support the juvenile court's underlying findings that parents failed to make significant progress with the case plan and that returning minor to their custody would create a substantial risk of detriment to his safety, protection or physical or emotional well-being.  Among the many relevant facts supporting this order, we highlight those we deem most significant.

First, with respect to the case plan, there is evidence in this record in the form of agency reports and testimony from social worker Pock establishing that parents failed in several significant regards to meet the court-ordered conditions for minor's return. Among other facts (which are described in much greater detail above):  father had failed to regularly participate in phone visits; mother had begun family therapy with a therapist who was not adequately informed regarding minor's circumstances; sanitation and safety concerns remained with respect to parents' home; and no evidence had been provided that minor had been enrolled at a school with the capacity to provide him with much-

9

needed speech and language services or therapy (which parents continued to deny minor needed).

Next, with respect to the substantial risk of detriment to minor's safety, protection or physical or emotional well-being should he return to parents' physical custody, there is ample evidence that parents remained incapable or unwilling to address the underlying concerns that had led to his detention in the first place. For example, as set forth in reports and testimony from minor's case workers and professional service-providers, parents continued to be uncooperative or mistrustful of those involved in minor's case and to deny his abuse or need for therapy and special education programs. Parents also remained unwilling to agree to maintain a relationship with minor's foster family and, at the same time, to protect or isolate minor from Brighting (who they continued to defend and rely on). Parents' conduct in these regards runs contrary to the well-supported opinions of Drs. Coffino and Lieberman that minor's well-being required that he continue receiving services and therapy and maintaining nurturing, stable and loving relationships, whether he stay here or return to Mexico.

This record, we conclude, provides substantial evidence in support of the juvenile court's findings that parents failed to make substantial progress with their case plan, with the result that a substantial risk of detriment to minor's safety, protection, physical or emotional well-being would be created should he return to their custody. As such, the juvenile court's decision to terminate services and set this matter for a permanency planning hearing was proper. Even accepting parents' argument that they have recently accomplished many of the agency's case plan goals, including the goals of improving the sanitation and safety of their home and participating in supervised Skype visits and therapy sessions, our role in this case requires consideration of all the evidence in the record and in a light most favorable to the juvenile court to determine whether the evidence supporting its decision is substantial. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705, 708, fn. 4.) Having done so, we conclude the evidence in this case is more than substantial. (Cf. *Jennifer A. v. Superior Court, supra,* 117 Cal.App.4th 1322, 1326, 1341 [granting writ petition and issuing a peremptory writ of mandate

directing the juvenile court to vacate its order terminating reunification services and setting a permanency hearing where, among other things, there was "no evidence" mother had a mental illness affecting her parenting skills or could not provide adequate living conditions for the minors].) Accordingly, parents' writ petition and request for a stay are both denied.

## DISPOSTION

The petition for extraordinary writ is denied on the merits (§ 366.26, subd. (*l*); Rule 8.452(h).) The request for a stay is denied as moot. Our decision is final immediately. (Rules 8.452(i) & 8.490(b).)


_____
Jenkins, J.


We concur:


_____
Pollak, Acting P. J.


_____
Siggins, J.

11